[S. F. No. 13777.  In Bank.—April 25, 1930.]

CALIFORNIA PACIFIC TITLE AND TRUST COMPANY, Petitioner, v. THOMAS F. BOYLE, Respondent.

James P. Sweeney and Henry E. Monroe for Petitioner.

Frank L. Fenton for Respondent.

John J. O'Toole, City Attorney, and Walter A. Dold, Chief Deputy City Attorney, *Amici Curiae* for Petitioner.

THE COURT.—In June of 1926 the board of supervisors of the city and county of San Francisco duly passed and approved a resolution reciting that public interest and necessity require the acquisition by the city and county of San Francisco, a municipal corporation, of certain lands, therein described by metes and bounds, amounting to approximately 550 acres. The resolution further recited that the said property is suitable, adaptable, necessary and required for the public use of the city and county of San Francisco as and for a public park; that it is necessary that a fee-simple title be taken for such use and the city attorney was ordered to commence proceedings in eminent domain against the owner of the described lands. The lands described in this resolution embrace more or less the area that is popularly known as McLaren Park in the Mission District of San Francisco and the total value of said lands is probably in excess of $2,000,000.

This resolution, it is admitted by all concerned in this proceeding, was never acted upon by the city attorney and no proceedings in eminent domain were ever brought, or any other proceedings taken pursuant thereto. The board of supervisors, however, did not entirely abandon the project to acquire a park in that section of the city and county. Each year, commencing with the fiscal year 1926–1927, the board of supervisors has appropriated various sums of money for the acquisition of various separate parcels of land in the general area in question. The apparent purpose of the board of supervisors was, and probably still is, to acquire during each year various parcels of the land in the general area, and after a number of years have elapsed, and all of the land in the general area has been acquired, to create a large park. The sum of $100,000 was appropriated and set aside for the purchase of such lands in the budget for the fiscal

year 1926–1927; the sum of $150,000 in the budget for the fiscal year 1927–1928; the sum of $150,000 in the budget for the fiscal year 1928–1929 and the sum of $150,000 in the budget for the present fiscal year of 1929–1930.

On November 26, 1928, a proposition was submitted to the voters at a general election to incur a bonded indebtedness for $2,000,000 for the acquisition and improvement of the entire tract in question. This proposition was defeated.

Despite this defeat of the project to buy all the lands at once, the board of supervisors included in the 1928–1929 budget and in the 1929–1930 budget an appropriation entitled ''Purchase of lands for public purposes in Mission District, $150,000.'' The board of supervisors regularly adopted a resolution, and the same was approved by the mayor, permitting such expenditures. On September 24, 1928, the clerk of the board drew a warrant on respondent herein, Thomas F. Boyle, auditor, in the sum of $125,553 in favor of petitioner, said sum to be payment in full for certain parcels of land in the general area of McLeran Park. Respondent Boyle refused to audit and approve the warrant and still continues to refuse to audit and approve the warrant. Petitioner, therefore, requests a peremptory writ of mandate commanding respondent to audit and approve the demand.

In his answer and return to the petition, respondent sets forth the facts above enumerated and contends that the park project will take many years to complete and that the total cost will exceed the income and revenue of said city and county for each fiscal year. Respondent also contends that the board of supervisors is attempting to purchase property on the installment plan and that under the authority of certain cases to be hereinafter discussed, all expenditures for the above purposes are without authority and violate certain provisions of the California Constitution and the city and county charter. Article XI, section 18, of the state Constitution provides, in part: ''No county, city, town, township, board of education or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless before or at the time of in-

curring such indebtedness provision shall be made for the collection of annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof on or before maturity, which shall not exceed forty years from the time of contracting the same."

Article XVI, section 29, of the charter of the city and county of San Francisco provides in part:

"When the supervisors shall determine that the public interest requires the acquisition of any land or lands or the construction or acquisition of any permanent building or buildings, improvement or improvements, the cost of which, in addition to the other expenses of the city and county will exceed the income and revenue provided for the city and county for any one year, they must by ordinance submit a proposition or propositions to incur a bonded indebtedness for such purpose or purposes to the electors of the city and county at a special election to be held for that purpose only."

The main question presented to us by this proceeding is: Can a city and county, with the apparent purpose of acquiring a large tract of land, the total cost of which would exceed the income and revenue of any one year, purchase land for public use in small parcels in the general area yearly, or does such a procedure violate the sections of the Constitution and charter above enumerated?

These sections have been a fruitful source of litigation. From an early date it has been held that so-called "contingent" installment contracts do not violate the constitutional provision quoted *supra*, nor do they violate city charters containing provisions similar to the one under consideration here. A leading case on the subject is *McBean v. City of Fresno*, 112 Cal. 159 [53 Am. St. Rep. 191, 31 L. R. A. 794, 44 Pac. 358, 359]. In that case the city of Fresno entered into a contract with McBean by which he agreed to take care and dispose of the sewage of the city for a period of five years for the sum of $4,900 per annum. For three years both parties to the contract fulfilled its conditions. The fourth year the city refused payment upon the ground that the contract was void, because it violated the state Constitution and the charter of Fresno. The court thus discusses the purport and intent of the constitutional provision under consideration: "In the constitutional provi-

sion under consideration, the framers had in mind the great and ever-growing evil to which the municipalities of the state were subjected by the creation of a debt in one year, which debt was not and was not expected to be, paid out of the revenues of that year, but was carried on into succeeding years, increasing like a rolling snowball as it went, until the burden of it became almost unbearable upon the taxpayers. It was to prevent this abuse that the constitutional provision was enacted. . . . Each year's income and revenue must pay each year's indebtedness and liability, and no indebtedness or liability incurred in one year shall be paid out of the income or revenue of any future year. The taxpayers of municipalities are thus protected against the improvident creation of inordinate debts, which may be charged against them and their property in ever-increasing volume from year to year.'' The court then points out that all creditors deal with a municipality with knowledge of this limitation of power and with knowledge of the fact that if the yearly revenue is not sufficient, the creditor cannot recover against the city because the security or assets to which he may look for payment have been exhausted. It was held that the contract under consideration did not violate the provisions mentioned above, the theory of the ruling is stated as follows:

''When it is come to consider the contractual relations between the city and appellant, it is at once seen that the city cannot be liable in any one year for more than four thousand nine hundred dollars, an amount far within the revenue derived to the sewer fund; and, further, that it cannot become liable for this amount at all until faithful service rendered by the contractor each year. . . . We base our view upon the conviction that, at the time of entering into the contract, no debt or liability is created for the aggregate amount of the instalments to be paid under the contract, but that the sole debt or liability created is that which arises from year to year in separate amounts as the work is performed.''

After a full review of the authorities, it was held that the contract was valid, operative and binding upon the city.

In *Smilie* v. *Fresno County*, 112 Cal. 311 [44 Pac. 556], the county had entered into an installment contract for the building of a courthouse, payments to be made as work was completed, out of the revenues of two succeeding years. The

revenue of neither year singly was sufficient to bear the total cost, but the payments falling due each year were within the income limit of that year. Upon the authority of the McBean case, *supra,* it was held that since each year's revenue was adequate to pay each year's indebtedness, the contract was not violative of the Constitution or charter.

Another leading case on the point is *Doland v. Clark,* 143 Cal. 176 [76 Pac. 958, 960]. There the city of Sacramento entered into two contracts for the purpose of having installed a certain telegraph system for the use of the police and fire departments. Payments were to be made monthly covering a period of five years. Monthly payments were for the rent of the instruments for that month, the city being given the privilege of purchasing the system for a stipulated sum, the amount paid as rentals to be applied on the purchase price. It was contended that the contracts were void for the reason that the total rental for the five-year period exceeded any one year's income. The court held otherwise, stating:

"It was evidently the intention of the framers of the Constitution to make the income and revenue of each year pay the indebtedness and liabilities incurred during such year, and that the revenues and income of a subsequent year should not be applied to pay liabilities of a past fiscal year. In this case, the contracts were made during the fiscal year ending June 30, 1900. It is evident that they did not create any liability at the time they were executed, except a contingent future liability. The language of the stipulation is that there were no funds at the time said alleged contracts were made and amended. At the time they were made, as amended, there was nothing due upon them, and there could not be, in the nature of things, any rent due until after the fiscal year, July 1, 1900. . . . The monthly rental under both contracts was six hundred and ninety dollars. This amount would not become due until the appellant had performed his contracts and put the systems contemplated by the contracts in operation. The amounts to become due on completion of the contracts by appellant might never become a liability upon the city. A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens. . . . There may be ample funds to pay

the rental when it accrues as provided in the contracts, if it ever should accrue.''

From these cases, and others that might be cited, it appears that before it will be held that a contract is violative of the constitutional or charter provisions under consideration, it must appear that at the time the contract was entered into, the city became obligated. to pay in that year more than its income for that year, and that an installment contract dependent upon services or materials to be furnished in the future does not violate the provisions mentioned if the services or material furnished in any one year for which a charge can be made, do not exceed the income and revenue for that year. In the case under discussion, it seems clear to us that the city and county of San Francisco has not exceeded its income or revenue for any one year by the purchase of individual parcels of land for a public purpose for a sum within the income and revenue of that year, even though it is the intent to ultimately acquire a large tract, the purchase price of which, *in toto,* would exceed the yearly income or revenue for any one year.

The above cases would be conclusive on the point were it not for a series of fairly recent cases which have, to an extent, limited the doctrine there enunciated. Three of these cases are sufficient to illustrate the nature of this limitation. They are *Chester* v. *Carmichael,* 187 Cal. 287 [201 Pac. 925, 928], *San Francisco* v. *Boyle,* 195 Cal. 426 [233 Pac. 965, 969], and *Mahoney* v. *San Francisco,* 201 Cal. 248 [257 Pac. 49].

In the Carmichael case, *supra,* certain parties deeded to the city of Sacramento certain lands for park purposes, subject to certain conditions subsequent to the effect that the city must expend $5,000 in the improvement of the park, the total cost of such improvements to be about $50,000. Failure to expend the above sum was to result in a forfeiture of the city's interest. The project would materially benefit other lands of the grantors in the vicinity. It was held that, in effect, this was an attempt to purchase the property on the installment plan. The court pointed out that although the city could not be compelled to spend the $5,000 each year, if they did not, the entire interest of the city would be forfeited. The grantors had completely fulfilled their part of the contract on the date of the conveyance. The city

must either expend the money from its future revenues to complete the work, or lose the property, together with all moneys already expended. The court, therefore, held that a debt was created at the time the contract was entered into for all sums subsequently to be paid, and, therefore, the constitutional provision was violated.

The court thus distinguishes the McBean case and the others cited, *supra:* "Here (the Carmichael case) the full liability to the grantors was created *upon the acceptance of the deed,* the entire consideration therefor having been furnished. The cases cited (McBean case, etc.) involved contracts for the furnishing to a city, in the future, of service, materials, etc., and it is held that no indebtedness or liability within the meaning of the constitutional provision is incurred until the furnishing of the service, materials, etc., the consideration for the payment to be made. The distinction is clear, and is recognized by many decisions. It is concisely stated in *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1 [43 L. Ed. 341, 19 Sup. Ct. Rep. 77], as follows: 'In the one case the indebtedness is not created until the consideration has been furnished; in the other, the debt is created at once, the time of paying only being postponed.' "

In *San Francisco* v. *Boyle, supra,* the following situation was presented: The city and an Exposition Company entered into an agreement which the parties denominated a lease. By the terms of this agreement the Exposition Company, as lessor, agreed to erect on certain lands designated, an exposition building at a total cost of $1,200,000. The agreement further provided that the Exposition Company leased this building to the city for a period of seventeen years subject to certain conditions, one of which was the payment of the sum of $100,000 to the Exposition Company by the city. It was the appropriation of that $100,000 that was under consideration by the court. The agreement had certain other provisions necessary to an understanding of the case. A payment of $185,000 yearly by the city was to be made to the Exposition Company and this payment was to be made yearly even though the building were not completed. The city agreed that during the term of the agreement, it would include in each of its annual budgets such amount as was required by the lease. The city was given an option

to purchase the property, the above payments to be applied on the purchase price. Also, all sums received by the city as rentals for the building were to go to the Exposition Company during the lease period and were to be applied upon the purchase price if the option to purchase was exercised by the city.

The court interpreted this agreement and held it was not a lease, even though so denominated, and held it was, in effect, an installment contract for the purchase of the land and building. The court said: "It also quite clearly appears that the so-called option on the part of the municipality to purchase the said property becomes, in effect, an increasing compulsion upon it to consummate such purchase, since not to do so would result .in the inevitable loss to the municipality not only of the primary and succeeding annual payments, which it is bound to make under this agreement, but also of the entire usufruct of the property during the period of its occupation."

The court then, following the Carmichael case, *supra*, held that the agreement violated the constitutional provision.

Somewhat the same problem was presented for consideration in *Mahoney* v. *San Francisco, supra* (the so-called Spring Valley case) where an alleged lease was under consideration. Under the terms of this "lease," large and undetermined sums had to be spent by the city in improvement and upkeep of the property. This "lease" likewise contained an option to purchase and a forfeiture clause.

The court properly found that the agreements were in fact not leases, but were, in effect, agreements to purchase the land on the installment plan. The court held that the doctrine of the Boyle and Carmichael cases, *supra,* was controlling, and that, therefore, the lease was void. At page 263, the court used the following language:

"We do not understand that the force and effect of the constitutional restrictions may be avoided—however beneficial such an avoidance may appear to be to the municipality, by permitting it to carry forward its plans—that expenditures may be incurred for improvements and for other public uses for which the municipality is liable and which though not definitely fixed or even estimated, will inevitably exceed the income and revenue provided for the fiscal year in which the contract is entered into, or any future year,

because, perchance, the question of the ability of the municipality to meet its obligations is left in a state of doubt or uncertainty occasioned by the phraseology of the contract or upon the theory that the possible occurrence of an event which in all probability will not happen, will happen, or the possible failure of a condition which must, from the logic of the situation, be performed will not be performed. If this be the rule of construction, the restrictive provisions of the Constitution and charter would become practical nullities and there would be no opportunity for the taxpayers to be heard as to the incurring of an indebtedness or liability that would become a charge upon the future income or revenue of municipal and public corporations.''

The court at some length discusses the McBean and other cases cited *supra* and distinguishes them substantially as was done in the Carmichael case.

We have no hesitancy in holding that the doctrine of the Carmichael, Boyle and Spring Valley cases, *supra,* has no application to the state of facts here presented. In all three of the cases cited there was a direct or indirect obligation on the city to pay the total purchase price at the time the contract was entered into even though the payments were to be made over a period of years. In the case at bar, each year the city purchases certain parcels of land, paying the full purchase price thereof. There is no obligation to buy any other land. The city owns the land purchased, absolutely, and has the complete usufruct thereof. No objection could be made to such a purchase if it were not for the fact that it appears to be the intention of the city to purchase an entire tract over a period of years. Each year the city gets the full consideration for that year's expenditures. In the event they do not purchase the additional land, the amount invested in the other parcels is not lost, for the city retains the land which it has purchased. The distinguishing characteristic between the two lines of authority already considered is very concisely stated by the United States Supreme Court in *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1 [43 L. Ed. 341, 19 Sup. Ct. Rep. 77], as follows: ''In the one case, the indebtedness is not created until the consideration has been furnished; in the other, the debt is created at once, the time of payment only being postponed.''

Respondent makes much of the fact that the voters defeated a bond project to purchase the entire tract at an election for that purpose. Respondent contends that this conclusively shows that the proposed park, in the opinion of the voters, was not necessary. It could with equal logic be contended that the voters were not in favor of a bond issue for the purchase of the park, but were in favor of the purchase of the site in the manner then being followed, that is by yearly purchases out of revenue. In any event, we are not called upon to decide this point. The wisdom or political expediency of entering into such contract has been left to the discretion of the municipality and may not be reviewed by the courts.

It is not necessary to pass upon the other questions presented by respondent. This proceeding is for a writ of mandate in reference to the payment of $125,550, duly appropriated and designated. What may or may not have happened in prior years with reference to exceeding the budget allowance is not now before us for decision.

It is ordered that a peremptory writ of mandate issue herein as prayed.